UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| CATHERINE PRIMM, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 3:10-0629 |
| | ) Judge Sharp |
| AUCTION BROADCASTING | ) |
| COMPANY, LLC, ABC | ) |
| MURFREESBORO, LLC and | ) |
| WILLIAM CAMPBELL, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM

Pending before the Court in this employment discrimination action under the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 *et seq.*, are the Motions for Summary Judgment filed by Defendant ABC Murfreesboro LLC's ("ABC's") (Docket No. 27) and Defendant Auction Broadcasting Company LLC's ("Auction's") (Docket No. 33). Those Motions have been fully briefed by the parties (Docket Nos. 28, 35, 36 & 40) and will be granted. Additionally, the parties have filed a Joint Motion to Dismiss Plaintiff's Retaliatory Discharge Claim (Docket No. 25) and that, too, will be granted.

### I. FACTUAL BACKGROUND

The majority of the relevant facts in this case are undisputed. Construed in Plaintiff's favor as they must be for present purposes, those facts are as follows:

ABC is an automobile auction company located in Murfreesboro, Tennessee. ABC hosts a weekly auto auction for area auto dealers and others in the automobile industry, including car rental companies and banks.

1

For a time relevant to this dispute, ABC was jointly owned by Auction and another entity called City Enterprises Inc. While Auction and City Enterprises were fifty percent owners of ABC, City Enterprises was the managing entity.

The daily operations of ABC are overseen by a General Manager. ABC also employs a sales team that is responsible for establishing and maintaining relationships with car buyers and sellers, and brokering deals that bring cars to ABC to be sold at auction.

Plaintiff was hired as a salesperson at ABC in January 2009. At the time of her hire, her father, Fred Walther ("Walther"), was ABC's acting General Manager. He set Plaintiff's salary based upon his view of what was customary in the industry for individuals with Plaintiff's experience.[1] Plaintiff agreed to a guaranteed base of $500 per week, plus a commission based on the number of cars sold. Plaintiff concedes that gender did not play a role in Walther's salary decision, and that her father treated her the same as other salespersons.

In February 2009, ABC hired William Campbell ("Campbell") with the view that he would eventually replace Walther in the role of GM. Campbell shadowed Walther during that month, learning the auction business while Walther continued to run all aspects of the auction, including the sales and operations meetings. In mid-March, Campbell assumed the role of General Manager.

Campbell hired Jerry Carson ("Carson") as a sales person in April 2009, and set his salary at $40,000 per year plus a bonus. Defendants claim that Carson's salary was based on his extensive managerial experience in the industry, his quality contacts in the automobile industry, and the company's expectation as to the business he would bring to the auction. Although Plaintiff claims

---

[1] At various points throughout her career, Plaintiff has worked in automobile sales, many times at places where her father had managerial responsibilities.

that she has more experience and more accounts than Carson, she concedes that Carson had extensive contacts within the franchise dealer community and those contacts could help bring more and better quality cars to the auction.[2]

On May 11, 2009, Plaintiff had a meeting with Campbell during which he addressed concerns with Plaintiff's performance. Thereafter, Plaintiff began keeping a diary and, according to Plaintiff, "wrote down what she thought was important at that particular time" in relation to Campbell. (Docket No. 37 at 5).

Plaintiff's diary entries include notations that Campbell (1) used the "f-word" three times on May 13, 2009; (2) told her on May 19, 2009 to "just sign it you bitch" when explaining a change in the bonus structure; (3) said within Plaintiff's earshot, "I guess I only have to suck his dick every other week or so" when discussing a deal on May 19, 2009; and (4) mentioned during a meeting on May 20, 2009, that he should have strippers at the auction in order to promote sales. (Docket No. 29-1 at 111-119). In response to Defendants' Motions for Summary Judgment, Plaintiff points to her deposition wherein she also claims that Campbell once told her that "I do not care if you have to go and suck dick to move more cars in here, but you better get more cars in here"; described one of Plaintiff's deals as "liked getting fucked in the ass and getting your dick broke off inside of you"; told customers on a sales trip with Plaintiff that "he had Hooter girls at the auction"; told Plaintiff once that she was a "strung out Mother," and said that, in a prior job, he hated having to fire a woman who had "large breasts." (Docket No. 36 at 2-3).

City Enterprises had a Sexual Harassment and Employment Discrimination Policy ("the

---

[2] Specifically, Plaintiff concedes Carson had significant managerial and sales experience at large automotive groups in the regional market, including stints as the General Sales Manager at Nissan of Rivergate and Hayes Automotive Group, Finance Director at Rivergate Toyota, and Sales Manager at Bill Heard Chevrolet.

3

Policy") which is applicable to employees of ABC. The Policy prohibited discrimination and harassment on the basis of, among other things, sex and gender, and provided a definition for sexual harassment. The Policy also prohibited retaliation.

In the Policy, employees were instructed to report immediately any sexually harassing conduct to their supervisor, manager, or human resource personnel. The Policy identified specific individuals who could be contacted and provided methods for making contact with them.

Upon her employment, Plaintiff received a copy of the Policy and received harassment training. Campbell also received a copy of the Policy and took the harassment training online.

On May 26, 2009, Plaintiff told her father (Walther) about Campbell's alleged comment that she needed to bring cars to the auction, even if that required having to "suck dick." Walther, in turn, called Auction's Chief Executive Officer Mike Hockett ("Hockett") and Chief Operating Mary Haller ("Haller") and complained about Campbell's conduct in relation to his daughter.

In response to Walther's complaint, Haller drove from Indianapolis, Indiana to Murfreesboro the following day. Upon arrival, she immediately began an investigation and interviewed Plaintiff in private. Plaintiff told Haller about Campbell's alleged comment regarding performing oral sex to get more cars at the auction, and provided Haller with her diary notes. Haller also interviewed Campbell.

After conducting her investigation, Haller consulted with other members of City Enterprises management, including Hockett.[3] On May 29, 2009, within three days of first being apprised of the

---

[3] Defendants also claim that Candy Marendt ("Marendt"), a City Enterprises human resource officer, contacted the Equal Employment Opportunity Commission ("EEOC"), which allegedly advised Marendt that Campbell's conduct did not warrant termination. Instead, the EEOC allegedly suggested that Campbell receive one-on-one sexual harassment training. Plaintiff objects to Marendt's assertions on hearsay grounds. This objection need not be resolved since, in formulating this opinion, the Court does not rely on Marendt's alleged contact with the EEOC.

4

situation, City Enterprises issued Campbell a written reprimand which indicated that he would be placed on probation for a period of 90 days, "that any future incident of this nature will be grounds for immediate termination," and that "ABC management will be continually monitor [sic] this situation." (Docket No. 29-1 at 125). Campbell was also informed that he would be required to take further sexual harassment training within the next 7-10 business days and that he was required to apologize to Plaintiff. (Id.). Campbell signed the written reprimand the same day, and it was made a part of his permanent personnel file.

Campbell complied with the requirements set forth in the written reprimand. Plaintiff reported no further issues with Campbell to anyone at ABC, Auction, City Enterprises, or to her father.

Campbell was terminated for performance issues on July 1, 2009. Walther re-assumed the role of interim General Manager and became Plaintiff's direct supervisor.

Based on these events, Plaintiff filed suit in the Rutherford County Circuit Court alleging that she was subjected to sexual harassment which created a hostile work environment, that she was discriminated against because of unequal pay, and that she was subjected to a retaliatory discharge as a result of bringing her concerns to management. Defendants removed the suit to this Court based upon diversity jurisdiction.

## II. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have

5

been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. APPLICATION OF LAW

As previously indicated, Plaintiff's claims are brought under the THRA and include allegations of a hostile work environment, unequal pay, and retaliatory discharge. In the Complaint, Plaintiff included Campbell as a Defendant, but now "concedes that there is not enough evidence to support individual liability [as] to Defendant Campbell." (Docket No. 35 at 2). Plaintiff has also agreed to dismissal of her retaliatory discharge claim. (Docket No. 25). Accordingly, there remains for consideration Plaintiff's hostile work environment and unequal pay claims against Defendants

6

ABC and Auction.[4]

A. <u>**Sexual Harassment/Hostile Work Environment Claim**</u>

Like Title VII, the THRA prohibits discrimination based on gender in relation to the "terms, conditions or privileges of employment." 42 U.S.C. § 2000e-2(a)(1); Tenn. Code Ann. § 4-21-401 (a)(1). "The phrase 'terms, conditions, or privileges of employment'. . . includes requiring people to work in a discriminatorily hostile or abusive environment." <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 21 (1993).

"[T]o make out a hostile-work-environment claim based on sexual harassment, an employee must show that: (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the charged sexual harassment created a hostile work environment; and (5) the employer is liable." <u>Randolph v. Ohio Dept. of Youth Serv.'s</u>, 453 F.3d 724, 733 (6th Cir. 2006). In this case, Plaintiff's sexual harassment claim fails because she has not shown that she was subjected to sexual harassment sufficient to create a hostile work environment, or that Defendants are liable under the facts which have been presented to the Court.

A hostile work environment arises "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." <u>Harris</u>, 510 U.S. at 21. To

---

[4] Although Plaintiff's claims are brought under the THRA, the Tennessee Supreme Court has repeatedly recognized that the Tennessee state legislature intends the THRA to be "coextensive with federal law." <u>Parker v. Warren County Util. Dist.</u>, 2 S.W.3d 170, 172 (Tenn. 1999). Thus, the Court may look to Title VII, 42 U.S.C. § 2000e *et seq.* in analyzing Plaintiff's sexual harassment/hostile work environment claim. <u>See</u>, <u>Carr v. United Parcel Serv.</u>, 955 SW.2d 832, 834-35 (1997). Additionally, the Court can look to the Equal Pay Act, 29 U.S.C. § 206(d) *et seq.*, in regard to Plaintiff's equal pay sex discrimination claim under the THRA. <u>See, Payne v. Goodman Mfg. Co., L.P.</u>, 726 F.Supp.2d 891, 910 (E.D. Tenn. 2010).

7

determine whether workplace harassment is sufficiently severe or pervasive, the Court is to consider the "totality of the circumstances." Williams v. General Motors, 187 F.3d 553, 562 (6th Cir. 1999). The Court is also required to utilize both an objective and subjective test: "the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard the environment as abusive." Bowman v. Shawnee State Univ., 220 F.3d 456, 462 (6th Cir. 2000). "Among the factors to be considered are 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Clark v. United Parcel Serv., Inc., 400 F.3d 341, 352 (6th Cir. 2005) (quoting, Harris, 510 U.S. at 23).

Although the inquiry is not subject to a "mathematically precise test," Harris, 510 U.S. at 22, and there is no bright line "'between a merely unpleasant working environment . . . and a hostile or deeply repugnant one,'" McPherson v. City of Waukegan, 379 F.3d 430, 438 (7th Cir. 2004) (citation omitted), the Court finds that Plaintiff has failed to show that the conduct of which she complains was sufficiently sever or pervasive so as to alter the terms and conditions of her employment. Several factors lead to this conclusion.

First, Plaintiff does not suggest that Campbell's conduct was ever physically threatening. Although this is not dispositive, it is something which is to be considered in the analysis. See, Black v. Zaring Homes, Inc., 104 F.3d 822, 824-25 (6th Cir. 1997) (recognizing that "verbal conduct alone can be the basis for a successful hostile work environment claim," but reversing jury verdict in favor or employee where "the plaintiff's claim was based on verbal conduct only," and she did not show that co-workers conduct created an objectively hostile work environment); Hoyle v. Freightliner,

8

LLC, 650 F.3d 321, 334 (4th Cir. 2011) (although "not controlling," fact that co-worker's actions were "not physically threatening" is "certainly an appropriate factor in assessing plaintiff's evidence").

Second, some of Campbell's alleged comments were not directed at Plaintiff and/or do not appear to be harassing comments directed at Plaintiff's gender, and, therefore, are of a more limited probative value. See, Bowman, 220 F.3d at 464 ("while [plaintiff] recites a litany of perceived slights and abuses, many of the alleged harassing acts cannot be considered in the hostile environment analysis because [plaintiff] has not shown that the alleged harassment was based upon his status as a male"). For example, Campbell's purported use of the word "fuck," while unquestionably vulgar, can be seen as an expression of frustration.[5] See, Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 810 (11th Cir. 2010) ("when used in context without reference to gender, 'fuck' and 'fucking' fall more aptly under the rubric of general vulgarity that Title VII does not regulate"); Murphy v. City of Aventura, 383 Fed. Appx. 915, 918 (11th Cir. 2010) ("remarks that plaintiff was a "dumb shit," "stupid fuck," and "dumb fuck" fell "under the rubric of general vulgarity that Title VII does not regulate"). Similarly, Campbell's comments about bringing Hooter girls to the auction was directed at customers which lessens the severity of the comments. See, Ladd v. Grand Trunk Western R.R., Inc., 552 F.3d 495, 501 (6th Cir. 2009) ("That other slurs . . were not directed at [plaintiff] diminishes their severity"); Black, 104 F.3d at 826 ("sex-based comments need not be directed at a plaintiff to constitute conduct violating Title VII ... [but] this fact contributes to our conclusion that the conduct here was not severe enough").

---

[5] In her deposition, Plaintiff indicated that Campbell did not link the "F-word" to women and admitted that she too used the word in the workplace. (Docket No. 29-1, Pf. Depo. at 140-150).

9

Third, when Campbell's statements that were not directed to Plaintiff and/or were not comments related to Plaintiff's status as a female are separated from his other comments, Plaintiff's complaint rests on no more than a handful of statements over a relatively short period of time. These would include his allegedly calling Plaintiff a bitch when insisting she sign an amendment to the bonus structure, telling her that he did "not care if you have to go and suck dick to move more cars in here," and his telling her that he hated having to fire a woman with "big breasts." Such statements are, of course, objectionable, uncivil, and wholly unacceptable in any workplace, but the limited number of statements over the few months that Plaintiff worked under the direction of Campbell weigh against a finding that his conduct was severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive. See, Whidbee v. Garzarelli Food Specialties, Inc., 233 F.3d 62, 69 (2nd Cir. 2000) ("Incidents that are 'few in number' and that occur 'over a short period of time' may fail to demonstrate a hostile work environment"); Albert v. City of Hartford, 529 F.Supp.2d 311, 326 (D. Conn. 2007) (collecting cases) ("Incidents that occur infrequently and over a short period of time may not suffice in proving a hostile work environment").

In making the foregoing observations, the Court is fully aware that a court should refrain from dividing and categorizing incidents such that it "divorc[es] them from their context and depriv[es] them of their full force." Williams, 187 F.3d at 562. After all, the Court is required to consider the totality of the circumstances which allows "that even where individual instances of sexual harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation." Id. at 563. However, even when all of the statements Plaintiff attributes to Campbell are taken into consideration, she has failed to show harassment

10

which rises to the level of a hostile work environment. See, Hensman v. City of Riverview, 316 Fed. Appx. 412, 417 & 419-20 (6th Cir. 2009) (no actionable harassment claim where evidence showed that, during a two month period, her boss (1) hugged her on three different occasions; (2) told her she looked "cute in her jammies" and repeated comment in front of others the next day; (3) told her she was "voluptuous" and made a hand gesture to demonstrate; (4) told her that she reminded him of his wife and that he was lonely because his wife did not currently live with him; (5) closed the door to his office while meeting with her more than once per day; (6) sniffed her and told her she smelled nice; (7) called her "beautiful" and told her "how attractive" she was; and (8) grabbed her arm as she was trying to get into her car after arguing with him); Curry v. Nestle USA, Inc, 2000 WL 1091490 at ** 4-5 (6th Cir. July 27, 2000) (summary judgment appropriate in hostile work environment case even though (1) managers hired exotic dancers for golf outing; (2) plaintiff's supervisor utilized a "tone and demeanor" that was "hostile and humiliating" during weekly meetings; (3) a senior vice president in human resources told plaintiff that "[i]f you want fair and equitable, you're not going to find it here" and asked plaintiff if her "behavior was a result of her pregnancy"; (4) another vice president called plaintiff a "f-ing bitch" while talking with her on the phone, told others plaintiff was a "f-ing bitch," and used profanity and berated plaintiff during meetings; and (5) the president said "Jesus F[-]ing Christ, what are you doing here?" when plaintiff returned to work following maternity leave); Black, 104 F.3d at 823-34 ($250,000 jury award in sexual harassment case reversed even though record disclosed evidence that, over three month period of time, (1) a manager stated that there was "nothing [he] like[d] more in the morning than sticky buns, while looking plaintiff up and down, smiling, and wriggling his eyebrows"; (2) meeting participants observed that land adjacent to a Hooter's restaurant should be caller "Hottersville,"

11

"Titsville," or "Twin Peaks"; (3) boss told plaintiff she was "paid great money for a woman"; (4) plaintiff was asked whether she was "dancing on the tables" at a biker bar; and (5) plaintiff's manager told a co-worker to "just get the broad to sign it").

Even if the foregoing is incorrect and Plaintiff has presented sufficient evidence for a jury to determine that Plaintiff's workplace was permeated with discriminatory intimidation and ridicule, her sexual harassment/hostile work environment claim nevertheless fails because the record fails to establish a basis for employer liability.

Under the Supreme Court's decisions in Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998) and Burlington Industries Inc. v. Ellerth, 524 U.S. 742, 765 (1998),[6] liability may be imposed on an employer where a supervisor engages in workplace harassment which leads to a tangible employment action, or where the employer fails to exercise reasonable care to prevent and correct known harassment by a co-worker. This is an affirmative defense which is established when the employer "establishes . . . by a preponderance of the evidence . . . (a) that [they] exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (b) that plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Thornton v. Fed. Express Corp., 530 F.3d 451, 456 (6th Cir. 2008).

"Generally, an employer satisfies the first part of this two-part standard when it has promulgated and enforced a sexual harassment policy." Gallagher v. C.H. Robinson Worldwide, Inc., 567 F.3d 263, 275 (6th Cir. 2009). "'[A]n effective harassment policy should at least: (1)

---

[6] The Tennessee Supreme Court has specifically held that the Faragher/Ellerth defense applies to sexual harassment claims under the THRA. Parker v. Warren County Util. Dist., 2 S.W.3d 170, 176 (Tenn. 1999).

12

require supervisors to report incidents of sexual harassment; (2) permit both informal and formal complaints of harassment to be made; (3) provide a mechanism for bypassing a harassing supervisor when making a complaint; and (4) provide for training regarding the policy.'" Id.

In this case, Plaintiff does not take issue with Defendants' sexual harassment policy as written. She argues, however, that "Campbell admitted that his training was a one hour web based seminar" and "one can wonder if he actually sat at his desk and completed the program on his own," and "question whether he read the much argued handbook." (Docket No. 36 at 8). However, Campbell has explicitly stated that he received the Policy, took the online training course and completed a test in relation to the course. (Docket No. 30 at 2). Plaintiff's speculation and conjecture will not defeat a properly supported motion for summary judgment. See, Lewis v. Philip Morris, Inc., 355 F.3d 515, 533 (6th Cir. 2004).

In any event, "[n]umerous courts have held that employers acted reasonably as a matter of law when they adopted valid sexual harassment policies, distributed those policies to employees via employee handbooks, and either *provided no sexual harassment training* or provided training only to managers." Helm v. Kansas, 656 F.3d 1277, 1289 (10th Cir. 2011) (italics added, collecting cases); see, Thornton v. Fed. Express Corp., 530 F.3d 451, 456–57 (6th Cir. 2008) (stating that an effective sexual harassment policy should, among other things, provide for training regarding the policy, but then observing that there was no dispute regarding the reasonableness of the employer's prevention efforts where the employer distributed its policy via an employee handbook and the plaintiff received more than one copy of the handbook during her employment). Moreover, the anti-harassment policy was effective because, upon receipt of Walther's complaint, Defendants took prompt remedial action which stopped the allegedly harassing conduct , and this remains so, even

13

though Plaintiff characterizes the punishment (which included additional training, probation, and monitoring) as "basically a slap on the wrist." (Docket No. 36 at 9). See, Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 340 (6th Cir. 2008) (citations omitted) ("An employer's response is unreasonable if it 'manifests indifference or unreasonableness in light of the facts the employer knew or should have known," but "[a] response is generally adequate, however, if it is "reasonably calculated to end the harassment").

As for the second element of the Faragher/Ellerth defense, Plaintiff claims that "[o]nce beginning his position as general manager, Campbell used offending language in day to day meetings" and suggests that Campbell's untoward conduct continued from that time forward. (Docket No. 36 at 2). Campbell assumed the managerial position in mid-March 2009, but Plaintiff did not complain until the end of May 2009. If Plaintiff felt she was being harassed from the time that Campbell assumed the role of General Manager, Plaintiff's delay in reporting *could* constitute unreasonable delay. See, Pinkerton v. Colorado Dept. of Transp., 563 F.3d 1052, 1063 (10th Cir. 2009) (collecting cases) (plaintiff's failure to report harassing incidents for two months even though aware of anti-harassment policy constituted unreasonable delay).[7]

In any event, when Plaintiff did report the harassment, she chose not to use the channels which were provided by Defendants, but opted to tell her father. Even then, according to Walther, her only complaint about Campbell was his comment about her having to perform oral sex if necessary to bring cars to the lot. This conversation was relayed to Hockett and Haller, and Defendants undertook a thorough investigation which resulted in putting an end to the harassing

---

[7] The Court emphasis the word "could" because context matters. As the court in Pinkerton recognized, an employee should not be required "to report individual incidents that are revealed to be harassment only in the context of additional, later incidents, and that only in the aggregate come to constitute a pervasively hostile environment." Id.

14

conduct. Given these circumstances, the Court finds that Defendants are entitled to summary judgment because the *raison d'etre* for the Faragher/Ellerth defense is to reward employers who implement and execute an effective sexual harassment policy. See, McCurdy v. Arkansas State Police, 375 F.3d 762, 771-72 (8th Cir. 2004) (employer is entitled to Faragher/Ellerth defense even in single incident cases if the employer takes swift and effective action the moment it learns about harassing conduct).

## B. Wage Discrimination Claim

To prevail on a wage discrimination claim, a plaintiff must initially "show that an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" Beck-Wilson v. Principi, 441 F.3d 353, 359 (6th Cir. 2006) (citation omitted). Contrary to Defendants' assertion, Plaintiff has forwarded enough evidence to establish a *prima facie* case because it is undisputed that Carson was paid more than she was, and both she and he were a part of ABC's sales forces. See, id. ("jobs need not be identical in order to be considered 'equal work'").

Once a *prima facie* is established, the burden shifts to the defendant to show that the wage differential is justified under "(1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex." Id. With regard to the fourth, catchall provision, "[e]xperience is a factor other than sex for purposes of the Equal Pay Act," and "'a new employee's prior salary' also constitutes a factor other than sex 'as long as the employer does not rely solely on prior salary to justify a pay disparity.'" Ambrose

15

v. Summit Polymers, Inc., 172 Fed. Appx. 103, 105 (6th Cir. 2006) (citation omitted).[8]

Leaving aside that Plaintiff's salary was set by her father while Carson's salary was set by Campbell, Defendants have carried their burden of establishing that Carson's pay was based upon factors other than sex. The undisputed testimony shows that Carson had over a decade of significant managerial experience (General Sales Manager, Finance Director, and General Manager) at major franchise dealerships and automotive groups in the region. It is also undisputed that ABC was interested in exploiting those contacts, being of the view that Carson could bring in more and higher caliber vehicles to the auction. In contrast, Plaintiff had mostly worked in a series of sales jobs at local auctions typically run by her father. She never held positions akin to those of Carson, and she does not claim otherwise.[9]

Additionally, prior to being employed at ABC, Carson earned around $150,000 per year in his role as manager or director of the large dealerships where he worked. (Docket No. 40 at 3). In contrast, immediately prior to going to work at ABC, Plaintiff worked part time at a car lot owned by her father, making $15,000 per year. (Docket No. 29-1, Pf. Depo. at 75).

No doubt, whether Carson was "worth" more to ABC than Plaintiff is highly subjective. But "'subjectivity is permissible' in employment decisions," including those related to pay "'provided that there are demonstrable reasons for the decision, unrelated to sex.'" Gaujacq v. EDF, Inc., 601 F.3d 565, 575 (D.C. Cir. 2010) (citation omitted). Plaintiff has not established that Campbell's

---

[8] Unlike in Title VII discrimination cases, the burden does not shift back to a plaintiff to show that a stated reason for a pay differential was pretextual. Rather, the employer is required "to 'prove' that the wage differential is justified under one of the four affirmative defenses," and "the plaintiff 'never bears the burden of *persuasion* regarding the affirmative defense.'" Beck-Wilson, 441 F.3d at 360 (citation omitted, italics in original).

[9] In her deposition, Plaintiff testified that she once was a manager of a sales and telemarketing staff consisting of three employees. (Docket No. 29-1, Pf. Dep. at 50).

16

subjective decision to pay Carson a higher base salary was based on sex and, in fact, testified in her deposition that, prior to bringing suit, she did not know how much Carson was paid, but brought her wage discrimination claim because she "like[]d rolling the dice and taking a gamble. (Id. at 192). Accordingly, summary judgment will be granted on Plaintiff's wage discrimination claim.

## IV. CONCLUSION

Based upon the foregoing, the Court will enter an Order granting ABC's and Auction's Motions for Summary Judgment (Docket Nos. 27 & 33), and granting the parties' Joint Motion to Dismiss Plaintiff's Retaliatory Discharge Claim (Docket No. 25).

*/s/ Kevin H. Sharp*
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE